Susan Grody Ruben, Esq.
Arbitrator
30799 Pinetree Road, #226
Cleveland, OH   44124
SusanGrodyRuben@att.net

## ARBITRATION PROCEEDING PURSUANT TO THE MULTIEMPLOYER PENSION PLAN ARBITRATION RULES FOR WITHDRAWAL LIABILITY DISPUTES OF THE AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| In the Matter of | ◆ | |
| | ◆ | |
| W.R. WEIS COMPANY | ◆ | |
| | ◆ | Arbitrator's |
| and | ◆ | Opinion |
| | ◆ | and Award |
| LABORERS' PENSION FUND | ◆ | |
| | ◆ | |
| AAA Case 51-621-00883-13 | ◆ | |

APPEARANCES:

On behalf of the Company:

> Leonard A. Gail, Esq. and Matt J. Reedy, Esq., Massey & Gail, Chicago, IL; William H. Nichols, Esq. and Devlin Schoop, Esq., Laner Muchin, Ltd., Chicago, IL

On behalf of the Fund:

> Karen I. Engelhardt, Esq., Allison, Slutsky & Kennedy, P.C., Chicago, IL

**EXHIBIT 1**

## INTRODUCTION

This arbitration involves a dispute regarding withdrawal liability under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1101, *et seq.*. Hearing was held March 18-19, 2015 in Chicago. The Parties filed responsive post-hearing briefs, the last of which was received by the Arbitrator on July 3, 2015. The Parties stipulated to an Award date of August 10, 2015.

## STIPULATED ISSUE

Has the Company (including its control group members) withdrawn from the Fund under Section 4203(b)(2) of ERISA, 29 U.S.C. § 1383(b)(2), despite the Building and Construction Industry exemption, by continuing, after ceasing to have an obligation to contribute to the Fund, to perform work in the jurisdiction of the Laborers' collective bargaining agreement to which the Company had been a party, directly or indirectly, of the type for which contributions were previously required to be made to the Fund?

<u>ERISA Section 4203(a) and (b)</u>

(a)     **Determinative factors**

For purposes of this part, a complete withdrawal from a multiemployer plan occurs when an employer—

      (1)     permanently ceases to have an obligation to contribute under the plan, or

      (2)     permanently ceases all covered operations under the plan.

(b)     **Building and construction industry**

      (1)     Notwithstanding subsection (a) of this section, in the case of an employer that has an obligation to contribute under a plan for work performed in the building and construction industry, a complete withdrawal occurs only as described in paragraph (2), if—

            (A)     substantially all the employees with respect to whom the employer has an obligation to contribute under the plan perform work in the building and construction industry, and

            (B)     the plan—

                  (i)     primarily covers employees in the building and construction industry, or

                  (ii)     is amended to provide that this subsection applies to employers described in this paragraph.

3

(2)    A withdrawal occurs under this paragraph if—

    (A)    an employer ceases to have an obligation to contribute under the plan, and

    (B)    the employer—

        (i)    continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or

        (ii)    resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption.

...

## SELECTED STIPULATIONS[1]

1. The Fund primarily covers employees in the building and construction industry within the meaning of Section 4203(b)(1)(B) of ERISA, 29 U.S.C. § 1383(b)(1)(B).

2. The Company was a party to a collective bargaining agreement with the Laborers' International Union of North America ("the Laborers' CBA") continuously at all relevant times until the Company terminated the Laborers' CBA by written notice given in September 2012. Under the Laborers' CBA, the Company was obligated to contribute according to the terms of the agreements contained in the locally-negotiated CBA.

---

[1] The selected stipulations are newly numbered, slightly regrouped, and minimally edited by the Arbitrator.

3.   The Fund is the Trust Fund that is established to receive contributions from the locally-negotiated agreements in Chicago and surrounding counties. Substantially all the employees with respect to whom the Company had an obligation to contribute to the Fund under the Laborers' CBA performed their work for the Company in the building and construction industry....

4.   Article V of the Laborers' CBA identifies the Work Jurisdiction, in relevant part, as follows:

> The work jurisdiction covered by this agreement shall include the work which has been historically or traditionally or contractually assigned to and performed by members of the Laborers' International Union of North America including, but not limited to, the tending of masons, unloading, mixing and all handling of all materials. Conveying of such materials by any mode or method; unloading, erecting, moving, adjustment and dismantling of all scaffolds erected by Signatory Employers for any purpose or use by his own employees or others and the starting, stopping, fueling, oiling, cleaning, operating and maintenance of all mixers, mortar pumps, forklifts and/or other devices under the direction of the employer or its representatives.

> ...

5.   During the calendar year 2009 and each calendar year through the present, Company employees have performed some of the tasks included in Article V of the Laborers' CBA. For example, Company employees have performed tasks using, including but not limited to, forklifts, mixers, wheelbarrows, and shovels.

6.   The Company is a construction contractor engaged in the installation, maintenance, and repair of stone or pre-cast concrete walls, floors, steps, soffits, and other stone

structures both inside and outside public, commercial, and private buildings.

7.   Since September 9, 1991, the Company has been a party to a collective bargaining agreement titled the International Panelization Agreement between the International Union of Bricklayers and Allied Craftsmen ("the BAC CBA").

8.   Since at least August 23, 2005, the Company has been a party to a Special International Masonry Industry Agreement ('the ICE CBA"), which is another collective bargaining agreement with the BAC.

9.   The BAC CBA obligates the Company to make pension contributions for covered work performed by Company employees. The ICE CBA obligates the Company to make pension contributions for covered work performed by Company employees.

10.  The Company employed its last Laborer in October 2009. The Company last paid any contribution to the Fund in and for the work month of October 2009.

11.  After October 2009, the Company continued to submit remittance reports to the Fund through and including August 2011. These reports reported no amounts due to the Fund.

12.  A long-standing custom and universally-recognized practice in the building trades is that Laborers assist Bricklayers and Marble Finishers assist Marble Masons.

## ADDITIONAL FACTS

1.  By letter to the Company dated August 9, 2011, the Fund
    informed the Company that the Fund's recent audit showed
    no additional contributions due from the Company to the
    Fund:

    > We are herewith enclosing for your information and
    > records, the results of the Fringe Benefit audit
    > performed recently by Richard J. Wolf and Company.

    > From this audit, it has been determined that there are
    > no additional amounts due the Trust Funds....

2.  On or about July 5, 2012, the Construction and General
    Laborers' District Council of Chicago and Vicinity, Laborers'
    International Union of North America, AFL-CIO ("the
    Laborers' Union"), filed a grievance against the Company.
    The Laborers' Union grievance alleged the Company was
    violating the Concrete Contractors Association collective
    bargaining agreement ("the CCA Agreement") Article XV by
    "using helpers instead of laborers" at the DePaul Theatre
    School Project in Chicago.

3.  On or about July 31, 2012, the Company filed unfair labor
    practice charges ("the ULP charges") with the National Labor
    Relations Board ("the NLRB") against the Laborers' Union, the
    Ironworkers Union, and the Bricklayers Union. The
    Company's ULP charges alleged violations of Section
    8(b)(4)(D)[2] of the National Labor Relations Act ("the NLRA")

---

[2] NLRA Section 8(b)(4)(D), 29 U.S.C. § 158(b)(4)(D), provides in pertinent part:

(b)     Unfair labor practices by labor organization

     ...

(4)

In Case 13-CD-086291 against the Laborers' Union, the Company charged the Laborers' Union had engaged:

> in activities calculated to restrain and coerce [the] Company with the object to force the employer to assign all work related to the handling of materials and installation of the support system of the stone façade at the DePaul Theater School Project located in Chicago, Illinois to members of Laborers' Local 6 rather than the members of the International Union of Bricklayers.

4. By letter to the Company dated August 3, 2012, after discussions between the Company and the Laborers' Union, the Laborers' Arbitration Board withdrew its July 5, 2012 grievance, contingent on the Company withdrawing its July 31, 2012 ULP charge:

> As we did not know you were a signatory to the International Agreement with the Mason Contractors' Association of America, Inc., we hereby withdraw the Grievance and Arbitration filed by Laborers' Local #6. Therefore, there is no pending matter pertaining to

---

...

(ii)    to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--

    ...

(D)    forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work....

> either the Laborers' District Council or Laborers', Local
> #6 involving your company. We are taking this action
> with your understanding that you are withdrawing
> your NLRB charged filed on July 31, 2012....

By letter to the NLRB dated August 8, 2012, the Company
withdrew the ULP charges.

5. By written notice to the Laborers' Union in September 2012,
the Company informed the Laborers' Union that the
Company was terminating its collective bargaining agreement
with the Laborers' Union effective December 9, 2012.

6. By letter dated December 18, 2012, the Fund informed the
Company that the Company owed the Fund an estimated
$488,780.33 in withdrawal liability.

7. By letter to the Company dated January 23, 2013, the Fund
informed the Company that the Fund's recent audit showed
no additional contributions due from the Company to the
Fund:

> We are herewith enclosing for your information and
> records, the results of the Fringe Benefit audit
> performed recently by Levinson Simon Hein & Bilkey,
> P.C..
>
> From this audit, it has been determined that there are
> no additional amounts due the Trust Funds.

8. By letter to the Fund dated March 19, 2013, the Company
requested the Fund to review the alleged withdrawal liability.
The Company stated the Construction Industry Exemption
exempted the Company from withdrawal liability.

9.  By letter to the Company dated June 3, 2013, the Fund informed the Company that the Company was liable for withdrawal liability because the Company:

> continues to perform the same work it performed prior to termination of the contract and in the same jurisdiction of the contract. As a result, [the Company's] permanent cessation of its obligation to contribute to the Pension Fund meets the requirements of ERISA § 4203(b)(2) and the assessment of withdrawal liability was proper, despite the construction industry exemption.

10. By letter to the Company dated August 9, 2013, the Fund informed the Company that the Company owed the Fund a revised $619,209 in withdrawal liability.

## THE PARTIES' POSITIONS

### The Company's Position

The Company has proven by a preponderance of the evidence that the Company did not continue to perform work in the jurisdiction of the Laborers' CBA of the type for which contributions were previously required. The Company did not employ any laborers after October 2009. In the time since then, the Company did not make any payments to the Fund, and was not required to make any payments to the Fund. Work

performed by individuals other than laborers was not work for which contributions ever have been required.

Laborers tended to bricklayers and finishers tended to setters. Consistent with the collective bargaining agreements, the Company made the required pension contributions to the Fund for every hour worked by laborers, and to the bricklayers' fund for every hour worked by bricklayers. The Fund and its auditors confirmed that the Company staffed its projects consistent with the Laborers' CBA and paid the fund as required thereby. By the end of 2009, the changed nature of the industry caused the Company to employ only setters and finishers, and not laborers, to staff the Company's non-high-rise podium work.

The Fund's apparent theory of withdrawal liability is that some of the work done by the Company's finishers could have been done by laborers. Ignoring the second half of the critical sentence of the construction exemption, and using an academic reading of limited portions of the work jurisdiction provisions in the Laborers' CBA, the Fund has taken over $700,000 from the Company.[3]

---

[3] If "of the type" means only "similar" tasks, the exemption's requirement that the work performed be within the collective bargaining agreement's jurisdiction would be eviscerated. Because finishers' hours tending to setters did not require

**The Fund's overreach should be rejected as legally improper for several reasons:**

> 1. The construction exemption applies because the Company did not continue to perform work for which contributions were previously required under the terms of the Laborers' CBA. That CBA did not require contributions for hours that could have been performed by laborers; it required contributions for hours actually performed by laborers.
>
> 2. The construction exemption applies because the Company did not continue to perform work in the jurisdiction of the Laborers' CBA. Longstanding

---

contributions to the Fund previous to the Company's termination of the Laborers' CBA, withdrawal liability is inappropriate even though a subset of the finishers' tasks tending to setters – e.g., handling stone or construction site clean-up – can be characterized as similar to laborers' work. *See Oregon-Washington Carpenters-Employers Pension Trust Fund v. BQC Const., Inc. Hardware Serv.,* 485 F.Supp.2d 1206, 1216-17, where the court held withdrawal liability could not be premised on allegedly owed contributions that had not previously been required:

> The arbitrator found that, to the extent [the employer] "occasionally performs installation and/or warranty work with its production employees," it was not subject to withdrawal liability. The arbitrator reasoned that § 1383(b)(2)(B)(i) provides for liability only where an employer continues to perform work of the type for which contributions were previously required, and "in this case, contributions were never required for that work prior to [termination of the collective bargaining agreement]." I find no error in the arbitrator's conclusion that [the employer] was not subject to withdrawal liability for in-house installation services that were consistently performed by [the Company's] production employees, rather than its installation employees. The record seems clear that while [the employer's] production employees occasionally did installation work, and continue to do occasional installation work, they were never covered by the [collective bargaining agreement], and were not required to have Plan contributions made on their behalf. Under the withdrawal liability requirements, these employees never did work "of the type for which contributions were previously required," and there are no unfunded, vested benefits for these employees. Thus [the employer] owes no withdrawal liability for them.

industry custom and practice to which the Parties have stipulated, and which is expressly incorporated into the work jurisdiction provisions of the Laborers' CBA, is that the Company's setters were properly tended to by finishers, not laborers.

3. The Fund waived as a matter of law its right to assert that the Company continued to perform work of the type for which contributions were previously required. The Fund never required contributions for work performed by finishers that allegedly was within the jurisdiction of the Laborers' CBA. The Fund audited the Company's compliance with its obligation to make required contributions. The first audit during the relevant time period covered two years during which the Company employed no laborers. The second audit – a self-described exit audit – covered the remaining period before the Company's termination of the Laborers' CBA, during which the Company continued to employ no laborers. The Fund and its auditors stated the Company had "complied with its fringe benefits contribution requirements," that the Company had "complied with its obligations to the Union and its related Funds," and that no additional contributions were required.

4. The Fund is estopped from asserting that the Company performed work of the type for which contributions were previously required. The Company reasonably relied to its detriment on the words and deeds of the Fund and its auditors that the Company had complied fully with its obligations to the Fund. The Company bid and staffed projects, submitted payments and paperwork to the Fund, and forewent NLRB adjudication of the DePaul covered-work claim by the Laborers' Union based on the Fund's statements and

actions that the Company was in compliance with its obligations to the Fund.

In 2002-2003, the Company bid on and won a job installing an intricate marble interior at 175 W. Jackson in Chicago. The Company used bricklayers and laborers to complete the work. Their work did not meet the quality requirements of the job, and the work was rejected. The Company had to hire setters and finishers to correct the work. The Company concluded it could not competitively bid and successfully complete that type of high-end work with bricklayers and laborers.

Laborers, in their traditional role supporting bricklayers, typically only handled material and mixed mortar. They did not install stone. Finishers cut stone, polished stone, caulked, grouted, drilled, patched, and installed stone. Setter/finisher teams perform different and higher quality work than laborer/bricklayer teams.

Since November 2009, the Company has not employed bricklayers and laborers. The industry had changed; the type of projects the Company bid for were better staffed by setters and finishers. Just as they had before November 2009, the Company's setters and finishers work on interior and exterior projects with a host of materials.

14

Only once after 2009 was an objection raised to the Company's use of finishers. In 2012, the Company bid on and was awarded the exterior limestone installation at DePaul University Theater School. The Company staffed the job in the same way it had staffed all of its other projects since November 2009 – with setters and finishers.

A few months after the start of the DePaul job, the Laborers' District Council filed a grievance against the Company, alleging that the Company was "using helpers instead of laborers." Two days later, the BAC sent a letter to the Company threatening to picket if the Company acquiesced to the Laborers' demand and replaced finishers with laborers. The Company sought a resolution from the NLRB by filing a ULP charge against both the Laborers and the BAC.

Three days after the Company filed the ULP charge, the Laborers offered to withdraw its grievance if the Company would withdraw its ULP charge. The Company agreed and withdrew its ULP charge. The Laborers withdrew its grievance. The Company's finishers continued on the DePaul project; the work was completed without further dispute.

From 1991, the Company's inception, through October 2009, the Company made contributions to the Fund for each hour worked by

laborers. At no point did the Fund ever question the Company's contributions. Even after the Company stopped employing laborers in November 2009, and returned the monthly form to the Fund without a check and often with "No Work" written on the form, the Fund never claimed contributions were due for hours worked by the Company's setters or finishers.

During the Fund's June 2011 audit, the auditor noted to the Fund that the Company had not "employed any laborers since Oct 2009" and that the "current operations use mostly masons/finishers." After the June 2011 audit, the Fund notified the Company that it had "complied with its fringe benefit contribution requirements."

After the Company notified the Laborers that the Company was terminating its CBA with the Laborers, the Fund arranged for another audit – a self-described "exit audit" to cover July 2011 through December 9, 2012. Like the previous audit, the Fund found that the Company had "complied with its obligations to the Union and its related Funds." The Fund made no claim that the Company owed contributions to the Fund for work performed by finishers or had otherwise failed to make any required contributions.

The Fund attempts to downplay the significance of these audits by asserting its auditors would not have known what work was being performed by which employees. But when the Fund believes work performed by other trades may be laborers' covered work, the Fund applies special scrutiny. For example, the Fund directed its auditors to call the Fund Field Director whenever the auditors found tuckpointers on an employer's payroll. This directive was given by the Fund to the auditors on account of "disputes over the type of work being done." (Co. Ex. 5.) Here, there was never a dispute over the type of work being done by the Company's finishers – it was never laborers' covered work.

The Fund also goes further to identify specific types of work that the Fund contended should have been picked up as laborers' covered work. Where an auditor finds an employee engaged in "flagging," the auditor is instructed to treat the flagger as a laborer. (Fund Ex. 25.) The Fund gave no directive to its auditors to consider any task performed by Company finishers as laborers' covered work. In certain instances, the Fund directs its auditors to request affidavits regarding work performed by certain employees. No affidavits were requested from the Company.

Waiver and estoppel defenses are available in ERISA cases. *See,
e.g., Iron Workers' Local No. 25 Pension Fund v. Klassic Services, Inc.*, 913
F.Supp. 541, 545-46 (E.D. Mich. 1996); *Black v. TIC Inv. Corp.*, 900 F.2d 112,
115 (7th Cir. 1990); *Roofers Local No. 30 Combined Pension Fund v. D.A.
Nolt, Inc.*, 719 F.Supp.2d 530, 540-41 (E.D. Pa. 2008) (finding estoppel
where fund attempted to change withdrawal date); *Suburban Teamsters
of N. Illinois Welfare and Pension Funds v. Hope Cartage*, 2003 WL
22116201 (N.D. Ill. 2003) (question of fact on affirmative defense of
estoppel of whether fund could collect delinquent contributions after
representing to employer there was no liability).

Waiver is a voluntary and intentional relinquishment of a known
right, expressed through acts, words, or conduct. *See PPM Fin., Inc. v.
Norandal USA, Inc.*, 392 F.3d 889, 895 (7th Cir. 2004). The Fund has waived
its right to now take the position that hours worked by the Company's
finishers is laborers' covered work of the type for which contributions
were required. Because the Fund has waived that right through its
express statements and actions, no withdrawal liability is appropriate
even if otherwise required under ERISA.

18

No matter what is says now, the Fund and its auditors never qualified or limited their written statements confirming the Parties' mutual understanding that the Company was not required to make contributions to the Fund for anyone but laborers. Indeed, the Fund directed its auditors to assume that Company "employees...who report to other union funds are doing work covered by those unions." (Tr. 388-89.) The Fund could have, but did not, instruct its auditors to "double bang" finishers' hours and wages. The fact the Fund did not so instruct its auditors confirms that the Parties' course of dealing was that the Company stopped performing work for which contributions were required when the Company ceased employing laborers in 2009. Whether contributions were "previously required" is the dispositive question, and it requires reference to the Parties' course of dealing.

While similar to waiver, estoppel is an equitable principal that also requires the additional element of reliance. Here, the Fund is "barred from asserting rights that might otherwise have existed against [the Company] who, in good faith, relied upon such conduct and has been thereby led to change his or her position for the worse." *Geddes v. Mill Creek County Club, Inc.*, 196 Ill. 2d 302, 313 (2001).

19

The Company contributed to the BAC Pension Fund for the hours worked by Company finishers. It never occurred to the Company that it should double pay for the same work and hours. *See Hancock v. Illinois Central Sweeping LLC,* 2014 WL 5822627, *5 ("*Hancock*") (N.D. IL 2014) (finding a "clean bill of health" from an audit supports reliance for an estoppel claim: "a reasonable factfinder could conclude that the conduct of Plaintiffs and their auditor in 2006 was misleading and that [defendant's] detrimental reliance on that conduct in making benefit payments was reasonable, and thereby find for [defendant] on its estoppel defense."). *Hancock* effectively is dispositive. That court permitted the employer's estoppel defense to proceed because the employer had reasonably relied on the fund's clean audits.[4]

Had the Fund ever asserted that the Company was required to contribute both to the BAC Pension Fund and to the Fund because the Fund considered the work laborers' covered work, or had there ever been a ruling that the Company had to employ laborers to some or all of the work the Company assigned to finishers, the Company would have

---

[4] While *Hancock* considered a delinquency claim, it goes to the heart of the estoppel question – the interpretation of an employer's obligations under a CBA, and to what degree a fund's statements and conduct prevent it from taking an inconsistent position later, as has been done here.

20

changed its behavior. The Company would have altered how it bid and staffed jobs. Indeed, it would have been irrational for the Company to terminate the Laborers' CBA and risk withdrawal liability if the Company had even an inkling that the Fund would reverse course and require the Company to double pay for the finishers' work. Instead, the Fund told the Company that the Company had complied fully with its contribution obligations. In reliance on the Fund's conduct, the Company terminated the Laborers' CBA.

The Fund concedes estoppel is an available affirmative defense. The Parties agree estoppel requires the Company to prove it reasonably relied on the Fund's words and conduct to the Company's detriment. It is undisputed that:

- The Fund knew the Company was performing work with setter/finisher teams, including exterior work, and that the Company employed exclusively setters and finishers after 2009;

- The Fund monitored the Company's contributions;

- The Fund commissioned auditors to confirm the propriety of the Company's contributions; and

- **The Fund unequivocally confirmed to the Company that the Company had fully complied with its obligations to the Funds.[5]**

The Fund contends estoppel does not apply because the Company assertedly did not rely to its detriment on the Funds words and deeds. Peter Weis testified, however, that the Company would have altered how it bid and staffed its jobs had the Fund ever suggested that contributions for finishers' work were required. (Tr. 163.) The Fund points to an email from Weis that does not refer to this. The subject matter of that email, however, has nothing to do with pension fund contributions.

The Fund asserted withdrawal liability against the Company apparently on the basis of a mistaken understanding of the facts. The Fund stated in an interrogatory response that:

---

[5] The Fund relies on *Pension Trust Fund for Operating Engineers v. Dalecon, Inc.,* 2014 WL 1007274 (N.D. Cal.) to argue that delinquencies and withdrawal liability are separate and unrelated. In *Dalecon,* the court evaluated a settlement and release whereby the parties had resolved a delinquency collection. Two years later, the fund asserted withdrawal liability. The court rejected the employer's release defense because the settlement agreement released only the delinquency action.

*Dalecon* does not apply here. First, estoppel is a legally available affirmative defense to withdrawal liability, and the Fund concedes as much. Second, the *Dalecon* employer had not contested whether it was continuing to perform work; in fact, it had waived the ability to do so and defended against withdrawal liability only on the grounds of the release. Here, the Company has always maintained Fund contributions were required for laborer hours, but not for finisher hours. It is the Fund that has reversed course and for the first time takes the position that worked performed by Company finishers is work for which Fund contributions are required.

> after the Fund learned that W.R. Weis had terminated its CBA
> with LIUNA, union representatives reported to the Fund that
> W.R. Weis continued to perform the same type of work that
> it had previously performed when it had contributed to the
> LPF, but that the work was now being reported to the
> pensions of other trades.

The undisputed evidence is otherwise – that the Company was
performing the same work both before and after the CBA and had always
reported work performed by finishers to the BAC fund.

The Fund's position is not supported by *Trustees of the Glaziers,
Architectural Metal and Glass Workers Local Union No. 27 Welfare and
Pension Funds v. Gibson,* 99 Fed. Appx. 740 (2004) ("*Gibson*"). The Fund
contends *Gibson* requires the Company to contribute to two funds for the
same hours worked. In *Gibson*, the employer "entered into CBAs with
two unions having jurisdiction to perform glazing work without
designating which union members were to perform which work." *Id.*, at
741-42. Here, however, the Local Laborers' CBA requires contributions
exclusively for work actually performed by laborers. Further, the double
liability arose in *Gibson* in the context of contribution delinquencies, not
withdrawal liability.

The Laborers' CBA did not require contribution for finishers' work. The Fund's position focuses entirely on the first part of the construction exemption – whether the Company performed work within the jurisdiction of the Laborers' CBA. That explains how the Fund takes the position that withdrawal liability attaches – that if the Company ever had a non-laborer clean a mortar mixer, for example, or tend to a mason laying pavers, the Fund alleges that is laborers' "covered work."[6]

The Fund, however, ignores the second half of the exemption's same sentence – whether the CBA required contributions for that work. MPPAA specifies that the work must be of the type for which contributions were required prior to the Company's termination of the CBA. Here, the work performed by the Company after December 9, 2012 was performed exclusively by setters and finishers. Because that work was not work for which contributions to the Fund were required under the CBA, withdrawal liability does not attach.

---

[6] The Fund's interpretation of "of the type" defies common sense. It cannot be said that every employer that terminates its Laborers' CBA becomes saddled with crippling withdrawal liability because it continues to have some employees do some small component of what its laborers did – handle some stone or pick up a broom to clean up a construction site. The Fund would characterize those tasks as sufficiently "similar" to laborers' cover work for which contributions were previously required.

24

The Local Laborers' CBA requires employers to contribute to the Fund for hours worked by laborers – not for hours performed by others such as finishers. Article V contains a "union shop clause" that requires all employees to join the union. Where, as here, no Company setter or finisher or anyone else after 2009 belonged to the Laborers' Union, the Laborers' Local CBA did not apply to any Company employee and the Company was not required to make contributions to the Fund.

The Fund conceded this at the arbitration. Paul Connolly, the Fund's representative, testified the Fund's official policy was that work performed by tradesmen of other unions is not the type of work for which contributions are required to the Fund. Connolly conceded that at no time were contributions to the Fund ever required for any hours performed by finishers, no matter the tasks they were performing.

Even if the CBA might be considered ambiguous regarding whether the Company performed covered work, the contractual ambiguity would be resolved by the parties' course of dealing. *See, e.g., Young v. Verizon's Bell Atl. Cash Balance Plan*, 667 F.Supp.2d 850, 898 (N.D. Ill. 2009), *aff'd* 615 F.3d 808 (7th Cir. 2010). Here, the Parties' consistent course of dealing confirms that work performed by the Company's finishers was not of the

type for which contributions were required. Had the Local Laborers'
Union contested the Company's work allocation, and had the tasks at
issue been given to laborers, then the Laborers' CBA would have required
the Company to make contributions to the Fund for that work.

The Fund introduced three decisions of the Impartial Disputes
Board for the Construction Industry from the 1970s. First, that these
cases exist demonstrates there are legal avenues by which an aggrieved
union can contest work allocation. Second, all three Impartial Disputes
Board decisions expressly state that the "action of the Joint Board was
predicated upon particular facts and evidence before it regarding this
dispute and shall be effective on this particular job only." (Fund Ex. 24 at
381-82, 386.) Third, none of these three decisions reference any
collective bargaining agreement work jurisdiction language.

The Fund also introduced a 1987 NLRB decision, *Laborers'
International and Cleveland Marble Mosaic Co. and Local 102, Marble
Finisher and Polishers*, 285 NLRB No. 34. Like the Impartial Board
decisions, this NLRB decision is expressly "limited to the controversy that
gave rise to this proceeding." (Fund Ex. 23 at 394.) This NLRB decision is
informative only insofar as it lays out the matrix by which jurisdictional

disputes are resolved when brought – a very different posture than here because here, no one sought resolution of their claims during the near decade the Fund now alleges the Company's finishers were performing laborers' covered work. Moreover, had the Local Laborers' Union actually brought a case for finishers' work, the Company would have prevailed under the six governing factors considered by the NLRB. *See, id..*[7]

Even if there could have been a successful jurisdictional claim brought against the Company, the Fund has failed to advance any explanation as to what specific work the Company performed after December 9, 2012 that the Fund claims is laborers' work. We do know, as Connolly testified, that many tasks performed by the Company's finishers could not have been performed by laborers. (Tr. 531 – drilling holes,

---

[7] The Fund contends this NLRB case establishes that interior work is finishers' work and exterior work is laborers' work. The supposed interior/exterior distinction is legally and factually baseless. The word "exterior" never appears in the Local Laborers' CBA. Nor does it appear in any of the other relevant documents. Ironically, if the Fund's interior/exterior distinction is valid, the Fund owes the Company contribution refunds for the many hours Company laborers worked on interior jobs.

Additionally, the Fund invokes a 1991 letter from the International Laborers' Union stating that the jurisdictional clause "is broad enough to cover all of laborers' work throughout the masonry industry." But as stipulated by the Parties, laborers' work has never included the tending to setters. In any event, this self-serving cover note does not and cannot overcome the language of Article V limiting the work to that which was "historically or traditionally or contractually assigned" to laborers.

caulking, applying epoxy, and patching stone not laborers' work; Tr. 532 –

tuckpointing not laborers' work.)

The Company requests the Arbitrator to find:

- The Company has not performed work within the jurisdiction of the Laborers' CBA of the type for which contributions were previously required; and

- The Fund must promptly return the monies paid by the Company with interest. *See* 29 C.F.R. § 4219.31(d) ("The plan sponsor shall credit interest on the overpayment from the date of the overpayment to the date on which the overpayment is refunded...."; and *Trustees of the Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Leaseway Transportation Corporation*, 76 F.3d 824 (7th Cir. 1996) (ordering return of withdrawal liability payment with interest).

### The Fund's Position

The Company does not have the requisite proof to overcome the

Fund's assessment of withdrawal liability. The fact that the Fund did not

collect contributions and found none due is not determinative of the work

the Company continues to perform in the jurisdiction of the Laborers' CBA

of the type for which contributions were previously required.

The core question is whether the Company is entitled to the

construction industry exemption from the withdrawal liability provisions

of MPPAA. The Company has not met its burden of proving that because the Company has continued to perform work in the jurisdiction of the type for which contributions to the Fund were previously required.

The Company claims no work is performed under the Laborers' CBA because work is performed by a combination of masons and finishers. Article V of the Laborers' CBA provides jurisdiction over work that:

> has been historically or traditionally or contractually assigned to and performed by members of the Laborers' International Union...including but not limited to the tending of masons, unloading, mixing and all handling of materials.

The NLRB has determined that exterior work in masonry construction which involves assisting in the installation of granite to the structural surroundings such as columns that support a building, have been historically assigned to laborers tending masons. *Laborers' International and Cleveland Marble Mosaic Co. and Local 102, Marble Finishers and Polishers*, 285 NLRB No. 34 (1987). *See also Impartial Disputes Board for the Construction Industry* (Fund Ex. 24.)

The Laborers' Union Manual of Jurisdiction, adopted in Article V of the Laborers' CBA, describes laborers' tasks as, *inter alia*:

> Tending shall consist of preparation of materials and the handling and conveying of materials to be used by mechanics

29

of other crafts, whether such preparation is by hand or any other process....The supplying and conveying of said material and other materials to such mechanic, whether by bucket, or wheelbarrow...or other motorized unit for such purpose, including forklifts.

Installation of pavers or exterior flooring has been a task traditionally performed by laborers either alone or in connection with brick or stone masons. Laborers disputed and were awarded the exterior foyer paving work at Trump Tower. Laborers also removed and replaced stone at Buckingham Fountain Plaza. Laborers worked significant hours for the Company on many of the exterior work installations shown on the Company website.

After 2009, when the Company no longer employed laborers, the Company performed the same work as it had before 2009. After 2009, however, the Company began assigning the work to different trades. It used finishers to assist masons, rather than laborers to assist bricklayers. The "type of work" at issue in the Company's invocation of the construction industry exemption includes tending work on exterior jobs – which was formerly performed by laborers employed by the Company and which is in the Laborers' historical jurisdiction. The tending of

exterior work does not become a different "type of work" because it is tending a marble setter rather than a bricklayer or stone mason.[8]

The Company filed NLRB charges regarding the DePaul project, but the Company withdrew those charges. The Company contends the NLRB would have ruled in the Company's favor. The Company's speculation regarding how the NLRB would have ruled must be rejected.

The Laborers' CBA requires pension contributions for employees doing "covered work." The Fund's Trust Agreement defines employees as:

> Any person employed by an Employer who performs work within the jurisdiction of the Union as said jurisdiction is set forth in any applicable Collective Bargaining Agreement or by any custom or practice in the geographic area within which the Employer operates and his Employees perform work.

The Company mistakenly contends the Laborers' CBA requires contributions on behalf of "Union" members. This notion has been

---

[8] This is not altered by the 3-M designation, which gave employees who were classified as bricklayers the ability to do the work of another trade within the BAC. Moreover, the Company argues there is no distinction between interior and exterior work. But according to the Company's BAC witnesses' testimony, that is not the case. Bruce Nagel testified that holding the 3-M card entitles the mechanic to work either outside or inside as a stone mason. It can be held by a bricklayer, entitling him to work inside. Bricklayers do exterior work. James O'Connor, the executive director of the Mason Contractors' Association of Greater Chicago testified that paver installation at Trump Tower, which went from the interior to the exterior, required the employer to hire laborers to complete the tending work.

31

rejected by the Seventh Circuit in *Central States Southeast and Southwest Areas Pension Fund v. Joe McClelland, Inc.*, 23 F.3d 1256, 1258 (1994). The Company's position is fundamentally flawed and ignores three decades of ERISA precedent establishing for whom contributions must be paid[9], as well as the common-sense distinction between the "work" at issue and the "employees" assigned to perform that work.

The Company fails to recognize that the CBA governs for whom contributions must be paid. In the Laborers' CBA, contributions are required "for each hour worked by all Employees covered by this Agreement." This term is in the Local Laborers' Agreement, which is adopted by Article VII of the International Laborers' Agreement signed by the Company.

The Seventh Circuit also has held that paying one fund does not relieve a debt under a separate agreement covering the same work description. *Trustees of the Glaziers, Architectural Metal and Glass Workers Local Union No. 27 Welfare and Pension Funds v. Gibson*, 99 Fed.

---

[9] *See also, e.g., Trustees of the B.A.C. Local 32 Insurance Fund v. Fantin Enterprises, Inc.,* 163 F.3d 965 (6th Cir. 1998) (contributions contractually required for all employees, not just union employees); and *Teamsters Local 348 Health & Welfare Fund v. Kohn Beverage Co.,* 749 F.2d 315 (6th Cir. 1984) (employees covered by a collective bargaining agreement unrelated to union affiliation).

Appx. 740 (2004) ("*Gibson*"). In *Gibson*, the employer remitted contributions for glazier work done by ironworkers to the ironworkers pension fund, and not to the glazier pension fund. That employer argued that assigning the glazing work to ironworkers excused the employer from making contributions to the glaziers' fund. The Seventh Circuit rejected the employer's argument based on ERISA Section 515, 29 U.S.C. § 1145, which requires that if work is performed within the jurisdiction of a collective bargaining agreement, the employer is required to make contributions unless the agreement provides otherwise, citing *Central States v. Gerber Truck Service, Inc.*, 870 F.2d 1148, 1153 (7th Cir. 1989) (interpreting Section 1145 to preclude employers from raising an assortment of affirmative defenses against multiemployer benefit funds even if those same defenses would defeat a claim by a union).

Similar to *Gibson,* the Company performed work that was included in both the BAC CBA and the Laborers' CBA. The Company attempts to distinguish *Gibson* because that employer "agreed" the tasks were the same. That is not a valid distinction. The employer in *Gibson* argued he was not liable because he had paid another fund. Whether he agreed the work was the same does not change the principle that hours worked by

33

one employee in work covered by two agreements results in liability for contributions to each separate fund for the identical hours.

Under MPPAA, assigning work to a different trade does not change the work. Here, tasks continued to be laborers' "covered work," albeit not performed by laborers. Work is not defined by which union employee is doing the work. Covered work is the actual tasks performed, i.e., the moving of stone to the job site, the mixing of the mortar to prepare the bed for installing stone, the unwrapping of stone, clean-up – all of these tasks related to the work performed by finishers and masons, which tasks also continued to be the work covered by the Laborers' CBA. The Company's change in work assignments from laborers to finishers reduced the Fund's contribution base, which is contrary to the purpose of MPPAA.

The Company points to Fund representative Paul Connolly's testimony, that it is the Fund's policy that work performed by members of another union is "not the type for which contributions are required." (Tr. 546-549.) The Company attempts to distort Connolly's rational explanation that it is the policy of the Fund that if contributions are paid on behalf of employees to another trade union fund, the Fund does not

try "to bang them twice." (Tr. 546.) Connolly's answer has nothing to do with the actual work for which contributions are required which is clearly defined by the Laborers' CBA, but rather the Fund's policy on payment for overlapping work. The Fund's position is that contributions to the Fund are not required based on comity to the employer and to the other trade. This does not mean that exterior work such as tending mechanics in the installation of pavers is not work covered under the Laborers' CBA.

With regard to the Company's argument that the Fund's audits created some sort of waiver, the audit findings have no bearing on the type of work in the jurisdiction of the Laborers' CBA. The auditors established that the purpose of the audits was to determine the accuracy of the employer's monthly contributions. The auditors also qualified their reports, that the accuracy of the payroll records and reporting to the Fund is the responsibility of the Company.

The Company argues the Fund's zero audit findings resulted in the Fund waiving its position that the Company performed work of the type for which contributions were previously required. Waiver is the voluntary and intentional relinquishment of a known right, privilege, or claim. *In Re Clark Retail Enterprises, Inc.*, 308 B.R. 869 (N.D. Ill., 2004). Before a party

is considered to have waived a right, "a clear and distinct manifestation of such an intent must be found." *Id.*, at 892. The party waiving must make a clear, unequivocal and decisive act indicating waiver. That did not happen here.

It is the auditors' standard procedure not to verify the tasks performed by other employees reported to another fund. Auditors do not have access to reviewing the work on the job site. It was the Company's duty to report finisher hours to the Fund. The Company failed to report this "covered work" under the Laborers' CBA.

The Company had notice of this since the inception of the Company signing the Laborers' CBA in 1991. Then, the Laborers' Union wrote to the Company that "the jurisdiction of laborers work is broad enough to cover all of Laborers' work throughout the masonry industry." The Company should have foreseen that by doing exterior paving work and installation of stone, it was continuing to perform tasks described in the Laborers' CBA. This is a more reasonable interpretation in light of the purpose of MPPAA and the exemption, rather than relying on audit findings where the auditor had no access to the actual facts concerning the type of work performed.

The issue here is different from that addressed by the auditors. The auditors are charged with identifying delinquencies for individual employees. In contrast, withdrawal liability is a determination of whether, when an employer ceases participation in a fund, there are unfunded liabilities for the employer should bear its fair share. The construction industry exemption limits the circumstances by which an employer may avoid paying that fair share, based on the employer's departure from the work at issue, not from the collective bargaining relationship.

There is no evidence of reliance for the Company's estoppel claim. Peter Weis' email correspondence regarding the DePaul project reflects no reliance on the 2011 audit report, a year before the DePaul project. In a letter to a BAC representative, Weis wrote he was concerned the Laborers would claim the work "because it is exterior stone." Without considering the Laborers' CBA, he claimed – not mentioning the zero audit report – that any claim by the Laborers "goes against my Marble agreement which clearly states that I can use all BAC members (Setter & Helper) to install interior or exterior stone." It does not appear from this letter that the Company relied on the Fund's policy of respecting the

employer's work assignment and not seeking double contribution coverage.

The Company's choice of which trade was to perform the tasks of laborers' covered work is of no consequence to the type of work performed. The Company has not met its burden of proving its work no longer includes work performed in the jurisdiction of the Laborers' CBA. The Company has not met the exemption and was liable for the withdrawal liability the Company has paid to the Fund.[10]

## ANALYSIS AND OPINION[11]

This was a hard-fought case with a voluminous evidentiary record. Notwithstanding the lengthy record, it all comes down to, as it often does, a few words in a statute and a few dispositive facts.

---

[10] The Arbitrator should strike Attachment A to the Company's Reply Brief because it is not part of the record.

[11] The Fund is correct that "Attachment A" to the Company's brief is not part of the evidentiary record. Accordingly, it is stricken and has not been relied upon by the Arbitrator.

## The Statute

The statutory language is in ERISA Section 4203(b)(2)(B)(i), 29 U.S.C. § 1383(b)(2)(B)(i):

> (2)     A withdrawal occurs under this paragraph if—
>
> ...
>
> (B)     the employer—
>
> (i)     continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required....

## The Facts[12]

Of particular relevance are the following record facts:

- From 1991-2009, the Company made pension contributions to the Fund on behalf of Company laborers.

- As of November 2009, the Company no longer employed laborers.

- On July 5, 2012, the Laborers' District Council of Chicago filed a grievance against the Company, alleging the Company had violated the CCA Agreement Article XV by using helpers instead of laborers on the DePaul project.

---

[12] Stipulated facts and additional relevant record facts are found on pages 4-10 *supra*.

- On July 7, 2012, the BAC sent a letter to the Company threatening to picket if the Company acquiesced to the Laborers' demand and replaced finishers with laborers.

- On July 31, 2012, the Company sought a resolution to the trade jurisdiction issue by filing ULP charges with the NLRB.

- On August 3, 2012, the Laborers offered to withdraw its grievance if the Company would withdraw its ULP charges. The Company agreed and withdrew its ULP charges. The Laborers withdrew its grievance. The Company's finishers continued on the DePaul project; the work was completed without further dispute.

- The Company terminated the Laborers' CBA effective December 9, 2012.

- On August 9, 2013, the Fund claimed the Company owed the Fund $619,209 in withdrawal liability.

Applying the Facts to the Statute

It is arguable that after 2009, the Company continued "to perform work in the jurisdiction of" the Laborers' CBA. (ERISA Section 4201(b)(2)(B)(i).) After 2009, the Company no longer employed laborers. After 2009, Company finishers may have, however, performed some tasks within the general jurisdiction of the Laborers' CBA. The Fund is correct that the nature of the work performed is dispositive, not which union an employee is associated with.

The fact that Company finishers may have, after 2009, performed some tasks within the general jurisdiction of the Laborers' CBA, however, is statutorily insufficient to create withdrawal liability. Additional language in ERISA Section 4201(b)(2)(B)(i) provides that withdrawal liability is created only if "contributions were previously required" for that work.

So the dispositive question is whether "contributions were previously required" for some of the post-2009 work performed by Company finishers. As demonstrated clearly in the record, contributions were *not* previously required for any post-2009 work performed by Company finishers.

Paul Connolly, Business Manager and Secretary-Treasurer of Laborers' International Union of North America, Union Local Number 4, who is a member of the Fund's Board of Trustees, testified that the Fund does not collect contributions from an employer that has already made contributions to another pension fund for the same work:

> [T]he policy of the Fund is that if contributions are made to another fund, then we allow that. We don't go back and try to bang them twice.

(Tr. 546.)  Here, the record indicates the Company makes pension contributions for its finishers' hours to the BAC fund.

Connolly's accurate testimony, that the Fund does not "bang" employers twice for the same work, leads to the unavoidable conclusion that the Company did *not* continue "to perform work in the jurisdiction of the collective bargaining agreement of the type <u>for which contributions were previously required</u>."  (29 U.S.C. § 1383(b)(2)(B)(i); emphasis added.)

The NLRB and Impartial Disputes Board decisions relied upon by the Fund, in part, to show the Company should have understood the potential for withdrawal liability based on laborer-type work being performed by non-laborers, are inapt because by their own terms, these decisions are limited to the specific facts in question.  Similarly, the Company cannot rely on its withdrawn ULP charges to the NLRB to lend credence to the Company's position, given that those ULP charges were never adjudicated.

<u>Estoppel</u>

In addition to the statutory bar to finding withdrawal liability, the Company has a compelling affirmative defense of estoppel.[13] The Fund, by its audits of the Company's contributions, did not *intentionally* waive any rights it may have had to assess withdrawal liability against the Company (but did not have; *see* statutory discussion *supra*). Estoppel, however would require that the Company reasonably relied to its detriment on the Fund's repeated written assurances that the Company owed no additional contributions to the Fund. And that is what happened.[14] Based on the Fund's assurances, the Company had no reason

---

[13] Estoppel is available in ERISA withdrawal liability matters. *See Roofers Local No. 30 Combined Pension Fund v. D.A. Nolt, Inc.,* 719 F.Supp.2d 530, 540-41 (E.D. Pa. 2008).

[14] Peter Weis testified:

    Q.    ...Had the Fund informed you that you owed contributions for the time period audited during which you did not employ laborers and during which you made contributions to the BAC fund, what would you have done?

    A.    We would have had to adjust to whatever was being done.

(Tr. 163.)

Similarly, when asked had a ruling been issued on a jurisdictional dispute, Peter Weis testified:

    Q.    If you had received some type of order resolving the jurisdictional question telling you that the finishers and setters could not handle

43

to believe it could eventually become liable for withdrawal liability based on hours not assigned to laborers.  In part based on those assurances, the Company terminated the Laborers' CBA and no longer employed laborers.

## AWARD

The Company (including its control group members) has not withdrawn from the Fund under Section 4203(b)(2) of ERISA, 29 U.S.C. § 1383(b)(2), pursuant to the Building and Construction Industry exemption because the Company has not, by continuing, after ceasing to have an obligation to contribute to the Fund, performed work in the jurisdiction of the Laborers' collective bargaining agreement to which the Company had been a party, directly or indirectly, of the type for which contributions were previously required to be made to the Fund.

Additionally, the Company is not liable for withdrawal liability on the basis of the affirmative defense of estoppel.

---

materials on the outside of projects and the work had to go to the BAC and laborers, how would you have run the Art Institute job?

A.     I would have had to abide by that new decision.

...

Q.     Had such a ruling of the type I just described been issued, would you have changed the bids you thereafter submitted?

A.     We would have had to.

(Tr. 112-13.)

Accordingly, the Fund is hereby ordered to refund to the Company by September 15, 2015, the withdrawal liability payments the Company has made to the Fund.

Additionally, pursuant to the calculation method in CFR Section 4219.32, the Fund is hereby also ordered to pay to the Company by September 15, 2015, 3.25% interest on the refund.[15]

<u>August 10, 2015</u>                    *Susan Grody Ruben*
                                         **Arbitrator**

---

[15] The 3.25% interest rate is derived from the chart found at www.pbgc.gov/prac/interest/oodwl.html which is based on 29 CFR Section 4219.32(b):

> Interest rate. Except as otherwise provided in rules adopted by the plan pursuant to § 4219.33, interest under this section shall be charged or credited for each calendar quarter at an annual rate equal to the average quoted prime rate on short-term commercial loans for the fifteenth day (or next business day if the fifteenth day is not a business day) of the month preceding the beginning of each calendar quarter, as reported by the Board of Governors of the Federal Reserve System in Statistical Release H.15 ("Selected Interest Rates").

If Fund rules adopted pursuant to 29 CFR Section 4219.33 exist, such rules will control regarding interest.