LABORERS' PENSION FUND and )
JAMES S. JORGENSEN, )
           )
           Plaintiffs, )       No. 15 C 07867
           )
      v. )
           )       Judge Edmond E. Chang
W.R. WEIS COMPANY, INC., )
           )
           Defendant. )

## MEMORANDUM OPINION AND ORDER

The Laborers' Pension Fund and James S. Jorgensen, as administrator of the Fund, sue W.R. Weis Company, Inc. to overturn an arbitrator's award that says the Fund needs to give back to Weis around $700,000 in disputed pension payments.[1] The Fund is a pension plan funded by companies who employ union laborers. Weis, a stone installation business, was a party to a collective bargaining agreement with the Laborers' International Union of North America (LIUNA); the agreement required Weis to contribute payments to the Fund. In October 2009, Weis no longer employed laborers and stopped contributing to the Fund. And in December 2012, Weis ended the collective bargaining agreement with LIUNA. The Fund believed that Weis was subject to withdrawal liability under the Employee Retirement Income Security Act of 1974 (ERISA), as amended by the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), and ultimately assessed a liability

---

[1] The Court has subject matter jurisdiction over this case based on 28 U.S.C. § 1331 and 29 U.S.C. § 1381 *et. seq.* (the Employee Retirement Income Security Act of 1974, as amended by the Multiemployer Pension Plan Amendments Act of 1980).

payment of $619,209 along with interest and penalties. Weis paid the full amount, but challenged the liability assessment in arbitration. The Arbitrator issued an award for Weis and against the Fund, finding that Weis did not owe any withdrawal liability. The Arbitrator also held that Weis was entitled to the defense of equitable estoppel. The Fund then filed this action, asking the Court to vacate the arbitration award, and Weis counterclaimed to confirm the award. Both parties moved for summary judgment. For the reasons explained below, the arbitration award is confirmed.

## I. Background

### A. Weis's Stone Installation Business

In 1991, Karen and William Weis founded W.R. Weis Company (for convenience, the company will be referred to as "Weis"), a stone installation company. DSOF ¶ 4; R. 17-2 to 17-3, Arb. Tr. 60:10-21.[2] In 1999, Peter Weis, Karen and William's son, became an assistant project manager for the company and later became the vice president. DSOF ¶ 7; Arb. Tr. 54:9-20, 59:18-60:4. The company "operates as a construction contractor engaged in the installation, maintenance, and

---

[2]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number. Citations to the parties' Local Rule 56.1 Statements of Fact are "PSOF" (for the Fund's Statement of Facts) [R. 23]; "DSOF" (for Weis's Statement of Facts) [R. 27]; "Def.'s Resp. PSOF" (for Weis's Response to the Fund's Statement of Facts) [R. 28]; and "Pls.' Resp. DSOF (for the Fund's Response to Weis's Statement of Facts) [R.30]. The parties have also stipulated to certain facts. R. 17, Joint Stip. Where a fact is admitted, only the asserting party's statement of facts is cited; where an assertion is otherwise challenged, it is so noted.

Further, to avoid overlap, the Court ordered the parties to file four total briefs: "Pls.' Br." (the Fund's opening motion for summary judgment) [R. 22]; "Def.'s Br. and Resp." (Weis's combined cross motion for summary judgment and response to the Fund's motion) [R. 26]; "Pls.' Reply and Resp." (the Fund's combined reply to its own motion and response to Weis's cross motion) [R. 31]; and "Def.'s Reply" (Weis's reply to its own motion) [R. 33].

repair of stone or pre-cast concrete walls, floors, steps, soffits, and other stone structures both inside and outside public, commercial, and private buildings." R. 17, Joint Stip. ¶ 2(h). Weis's website says that it does pre-construction work (selecting materials, developing budgets and construction plans), new construction (installing stone for interior and exterior projects), restoration and historical preservation (patching, cleaning, sealing, and installing stone), and building maintenance and renovation (patching, cleaning, sealing, and installing stone). R. 18-4, Def.'s Exh. 4, Weis Website at 944.

Weis has always been a union employer; when it opened its doors in 1991, it signed two collective bargaining agreements (CBAs): one with the International Union of Bricklayers and Allied Craftsmen (BAC), and another with the Laborers' International Union of North America (LIUNA). DSOF ¶ 4; R. 17-1 at 1, Joint Exh. A, LIUNA CBA; R. 17-1 at 9, Joint Exh. B, BAC CBA. In 2005, Weis also signed a Special International Masonry Industry Agreement (ICE CBA),[3] which was another agreement with the BAC union. Joint Stip. ¶ 2(k); R. 17-1 at 25, Joint Exh. C, ICE CBA. As for the LIUNA CBA, it had a "work jurisdiction" clause, which provides that laborers' work

> include[s] the work which has been historically or traditionally or contractually assigned to and performed by members of the Laborers' International Union of North America including, but not limited to, the tending of masons, unloading, mixing and all handling of all materials. Conveying of such materials by any mode or method; unloading, erecting, moving, adjustment and dismantling of all scaffolds erected by Signatory Employers for any purpose or use by his own employees

---

[3]The "ICE" part of the acronym comes from the first few words of the pertinent entity's name, the International Council of Employer (ICE) of the Bricklayers and Allied Craftsmen.

> or others and the starting, stopping, fueling, oiling, cleaning, operating and maintenance of all mixers, mortar pumps, forklifts and/or other devices under the direction of the employer or its representatives.

LIUNA CBA art. V, ¶ 1. The LIUNA CBA is an international (or master) agreement; more specific issues involving "wages, fringe benefit contributions, hours and working conditions" are governed by "the locally negotiated collective bargaining agreement." *Id.* art. VII, ¶ 1. The local CBA, which is between the Concrete Contractors Association of Greater Chicago and the Construction and General Laborers' District Council of Chicago and Vicinity, then clarifies that "the Employer agrees to make a pension contribution of $8.57 per hour for each hour worked by all Employees covered by this Agreement in addition to the wages and welfare payments herein stipulated. This $8.57 per hour shall be paid to the Laborers' Pension Fund or to a designated appointee at the end of each month." R. 18-26, Pls.' Exh. 26, Laborers' Local CBA art. VIII, ¶ 4. To carry out these agreements, Weis's payroll department created a list of all hours worked by laborers each month in order to calculate the pension payments. DSOF ¶ 24; Arb. Tr. 142:1-15. Weis then sent the Fund a monthly check along with supporting payroll documents. DSOF ¶ 24; Arb. Tr. 150:4-15. Similarly, Weis made monthly pension payments into the BAC Fringe Benefit Fund for hours worked by bricklayers. DSOF ¶ 6; Arb. Tr. 141:1-24.

Until the early 2000s, Weis employed exclusively laborers and bricklayers in its stone business. DSOF ¶ 5; Arb. Tr. 75:14-76:5. Bricklayers are generally responsible for layouts, stone installation, and stone adjustments, including drilling

into brick or stone. PSOF ¶ 42; Arb. Tr. 475:6-476:19. The parties agree that "[a] long standing custom and universally recognized practice in the building trades is that Laborers assist Bricklayers … ." Joint Stip. ¶ 3(d); PSOF ¶ 45. So laborers "tend to" bricklayers by unloading and moving material, bringing the stones to the bricklayers, mixing mortars, and cleaning debris on the job site. PSOF ¶ 44; Arb. Tr. 471:16-473:16, 475:12-476:5.

Weis contends that in the early 2000s, its business shifted due to industry changes. DSOF ¶ 10; Arb. Tr. 75:14-76:5. For one, the marble and bricklayer unions merged, so Weis was able to employ marble setters and finishers in addition to bricklayers and laborers. *Id.* Marble setters were skilled marble craftsmen who installed stone, Arb. Tr. 78:23-79:8, and were assisted, or "tended" to, by marble finishers, DSOF ¶ 10; Arb. Tr. 84:14-87:14. Finishers can perform laborers' tasks, such as unloading trucks, shaking out stone, preparing marble pieces, cleaning job sites, and mixing mud. DSOF ¶ 13; Arb. Tr. 275:1-280:3. But they can also cut, polish, grout, caulk, drill holes, apply epoxy, and patch stones. *Id.*; Arb. Tr. 86:2-14. The parties agree that it is "long standing custom and universally recognized practice in the building trades … that Marble Finishers assist Marble Masons." Joint Stip. ¶ 3(d); DSOF ¶14. The local marble CBA required that an employer hire one marble finisher for each marble setter on the job. DSOF ¶ 10; Arb. Tr. 84:14-87:14.

According to Weis, the merger helped its business because Weis was able to bid more competitively for interior marble jobs using marble setters and finishers,

who were more skilled at stonework than bricklayers and laborers. DSOF ¶ 15; Arb. Tr. 75:14-81:1. Weis contends it was able to deliver products and finishes that it had not been able to provide in the past, and directly hire marble setters and finishers rather than subcontract for their services. *Id.* The merger also cut down on costs because Weis no longer needed to buy material that was finished at the factory; instead, it could purchase the pieces separately and install them in the field. *Id.* According to Peter Weis, this was a welcome change because during the late 90s, there was less stonework for tall high-rises. DSOF ¶ 8; Arb. Tr. 63:13-64:13; 71:6-72:2. Instead, the company began doing smaller, lower work involving podiums (the entrance area near the base of a building), fountains, and interior lobbies. *Id.* This new work also required more detail and craftsmanship; for example, in the early 2000s, Weis won a job installing a marble interior at 175 West Jackson, but its work, which was done with bricklayers and laborers, was rejected. DSOF ¶ 9; Arb. Tr. 77:7-78:22. Weis had to hire a company that employed marble setters and finishers to fix the work. *Id.* But with the new merger, Weis was able to take on projects like 175 West Jackson and the Hyatt Center, the latter of which required work with limestone, a difficult material, corners that needed to look like "seamless large chunks of stone," and complicated radius patterns. DSOF ¶¶ 15-16; Arb. Tr. 95:15-96:4. Peter testified that he believed the merger between the marble and bricklayers' unions helped him to successfully bid on and complete these new types of projects. *Id.* Although the Fund argues that "[t]he fact that the work necessitated higher skilled workers is unsupported by the evidence," it does not point to any

evidence to the contrary. Pls.' Resp. DSOF ¶ 8.[4] Instead, the Fund believes that Weis's staffing change was driven by its "conscious Company strategy" to cut costs and replace laborers, and not because of any changes in the available work. R. 20-1, Pls.' Arb. Br. at 8, 30. As far as the Court can tell, the Arbitrator did not make a factual finding as to which of these narratives was correct.

Nevertheless, it is undisputed that Weis employed its last laborer in October 2009, when it also made its last payment into the Fund. Joint Stip. ¶ 3(a). It continued to send monthly remittance reports to the Fund, showing that no contributions were due or paid. *Id.* ¶ 3(b). The parties seem to agree that marble finishers then took on tasks formerly done by laborers but disagree about its significance. The parties stipulated that "[d]uring the calendar year 2009 and each calendar year through the present, employees of Weis have performed some of the tasks included in [the laborers' work jurisdiction]." Joint Stip. ¶ 2(f); PSOF ¶ 32. Weis also admits that "certain tasks such as cleaning up debris or unloading stone occur at every job site," so it was "inevitable" that finishers did some work in the laborers' work jurisdiction. R. 26, Def.'s Br. and Resp. at 13. But Weis argues that these overlapping tasks are "of no significance" because they are not the type of "work which has been historically or traditionally or contractually assigned to and performed by members of the Laborers' International Union." *Id.* (citing LIUNA

---

[4]The Fund points to Peter's testimony that in the mid-2000s, "as a stone contractor, we bid stone installation … . So anything that had that material on it, we would bid and try to competitively win." Arb. Tr. 59:7-17; Pls.' Resp. DSOF ¶ 8. But Peter's testimony that Weis bid on all types of stone installation projects does not contradict his testimony that the available stonework moved away from large high-rise buildings and toward more skilled stonework.

CBA art. V). As the argument goes, because finishers historically tend to *setters* and laborers historically tend to *bricklayers*, the finishers were not doing work that was covered in the laborers' CBA because the finishers were tending to setters, and not to bricklayers. *Id.* at 13-14. That is, "the similarity in tasks performed by Finishers and Laborers is not dispositive because the tending relationship is decisive." *Id.* The Arbitrator, however, rejected Weis's argument on this particular point, explaining that "[t]he Fund is correct that the nature of the work performed is dispositive," and that "after 2009, the Company may have … performed some tasks within the general jurisdiction of the Laborers' CBA." R. 1-1, Arb. Award at 40. It is undisputed that this overlapping work was also covered in the BAC and ICE CBAs, *id.* ¶ 2(f) n.1, and that Weis contributed to the BAC pension fund for these hours, DSOF ¶ 22; Arb. Tr. 141:1-24.

In 2011, an outside company audited Weis's Fund contributions for the time period from July 2007 to June 2011. DSOF ¶ 33; R. 17-1 at 69, Joint Exh. E, Audit Findings. The Fund concluded that "there are no additional amounts due to the Trust Funds" and that Weis "has complied with its fringe benefit contribution requirements." Audit Findings at WEIS000011-12. The auditor also wrote that "[t]he company saw a significant decrease of business after the summer of 2009 … . They also have not employed any laborers since Oct 2009. They [sic] current operations use mostly masons/finishers." R. 19-11, Def.'s Exh. 13, Additional Audit Docs. at WEIS000015. On September 9, 2012, Weis formerly terminated its LIUNA CBA, after which the Fund conducted a second audit. Audit Findings at 73. In

January 2013, the Fund again concluded that "the contractor has complied with its obligations to the Union and its related Funds for the examination period" of July 1, 2011 through December 9, 2012, and that "there are no additional amounts due [to] the Trust Funds." *Id.* at 73-74.

## B. Fund Contribution Dispute

Despite the audit results, on December 18, 2012, the Fund informed Weis that it owed additional contributions for withdrawing from the multiemployer plan. Joint Stip. ¶ 4(a); R. 17-1 at 104, Joint Exh. G, Withdrawal Liability Demand. The Fund assessed an estimated liability of $488,780.33 for withdrawing from the Fund in 2012, when Weis terminated its CBA with the laborers. *Id.* In response, Weis submitted a request for review under an ERISA provision that allows an employer, within ninety days of receiving notice of withdrawal liability, to challenge the pension fund's determination. 29 U.S.C. § 1399(b)(2); Joint Stip. ¶ 4(b); R. 17-1 at 110, Joint Exh. H, Request for Review. In its request for review, Weis argued that it was entitled to an exception for the construction industry, in which an employer is deemed not to have withdrawn—and thus is not subject to withdrawal liability— unless it "ceases to have an obligation to contribute under the [pension] plan," and either "(i) continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or (ii) resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption." Request for Review (quoting 28 U.S.C. § 1383(b)(2)). In the review

letter, Weis also explained that it had not employed any laborers since late 2009. *Id.* On June 3, 2013, the Fund declined to retract the December 18, 2012 assessment. Joint Stip. ¶ 4(c); R. 17-1 at 116, Joint Exh. I, Fund Response. Two months later, it issued a revised demand letter adjusting the withdrawal date from December 2012 to October 2009, and increasing the withdrawal liability from $488,780.33 to $619,209. Joint Stip. ¶ 4(d); R. 17-1 at 121, Joint Exh. J, Revised Demand Letter.

At the time it received the revised demand letter, Weis had only paid two liability installments of $43,620.25 each. *Id.* Weis did not make any more payments and instead initiated arbitration in August 2013 to determine the propriety of the withdrawal liability. PSOF ¶ 18; R. 13, Def.'s Answer ¶ 12. Meanwhile, in September 2013, the Fund filed a federal lawsuit to collect the full withdrawal liability as well as interest and penalties. PSOF ¶ 17; *Laborers' Pension Fund v. W.R. Weis Co., Inc.*, 13-CV-6698 (N.D. Ill.). The Fund moved for summary judgment, which the district court granted on the issue of liability because of ERISA's "pay now, dispute later" rule—that is, although an employer may initiate an arbitration to challenge the withdrawal liability, it must pay the disputed amount during the pendency of the arbitration. *Laborers' Pension Fund v. W.R. Weis Co., Inc.*, 2014 WL 5488387, *2-3 (N.D. Ill. Oct. 30, 2014) (quoting 29 U.S.C. § 1399(c)(2) ("Withdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor … notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule.")). The parties came to an agreed

damages judgment on December 15, 2014. PSOF ¶ 17. Weis then made full payments in accordance with the judgment. *Id.*

On March 18-19, 2015, an arbitration hearing was held to determine the issue of withdrawal liability. PSOF ¶ 18. The Arbitrator ruled in favor of Weis, holding that Weis was not liable for withdrawal payments because it did not "continue[] to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required" under 29 U.S.C. § 1383(b)(2)(B)(i). Arb. Award. at 40-42. In other words, even though Weis continued employing non-laborers to do some work covered by the laborers' CBA, Weis never had an obligation to contribute to the Fund for non-laborers' work, when it had already contributed to the other workers' pension funds. *Id.* at 41-42. The Arbitrator also held that Weis could assert an affirmative defense of equitable estoppel because Weis "reasonably relied to its detriment on the Fund's repeated written assurances that the Company owed no additional contributions to the Fund." *Id.* at 43.

In September 2015, the Fund filed this action, asking the Court to vacate the arbitration award. R. 1, Compl. Weis counterclaimed, asking the Court to confirm the award. R. 12, Def.'s Counterclaim. Both parties now move for summary judgment. R. 21, Pls.' Mot. Summ. J.; R. 25, Def.'s Mot. Summ. J. For the reasons explained below, Weis's motion is granted, and the Fund's motion is denied.

## II. Legal Standard

The MPPAA allows district courts "to enforce, vacate, or modify the arbitrator's award," 29 U.S.C. § 1401(b)(2), but applies "a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct," 29 U.S.C. § 1401(c). This means that "[an arbitrator's] findings of fact may be set aside only if clearly erroneous." *Cent. States, Se. & Sw. Areas Pension Fund v. Midwest Motor Exp., Inc.*, 181 F.3d 799, 804-05 (7th Cir. 1999) (citation omitted). Although clearly erroneous "is not a rubberstamp," it means that "the reviewing court, after duly acknowledging the superior proximity of the factfinder to the witnesses, is firmly convinced that the finding is erroneous." *Santa Fe Pac. Corp. v. Cent. States, Se. & Sw. Areas Pension Fund*, 22 F.3d 725, 727 (7th Cir. 1994) (citations omitted). The same clear-error standard applies to the arbitrator's application of law to facts. *Cent. States, Se. & Sw. Areas Pension Fund v. Nitehawk Exp., Inc.*, 223 F.3d 483, 488 (7th Cir. 2000) (mixed questions of law and fact reviewed for clear error); *Midwest Motor Exp.*, 181 F.3d at 804-05 (same). Any legal conclusions, however, are subject to *de novo* review. *Midwest Motor Exp.*, 181 F.3d at 804-05; *Cent. States, Se. & Sw. Areas Pension Fund v. Safeway, Inc.*, 229 F.3d 605, 609 (7th Cir. 2000).

Furthermore, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). As noted above, here both parties moved for summary judgment, so in evaluating the Fund's motion the Court must draw reasonable inferences in Weis's favor, and vice-versa on Weis's motion. The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that she is entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Withdrawal Liability

### 1. Statutory Context

The parties agree that the Fund is a multiemployer pension plan governed by ERISA and the MPPAA. Joint Stip. ¶ 2(a). In 1974, Congress enacted ERISA to regulate private pension and health plans. 29 U.S.C. § 1001 *et seq.* At issue in this

case are multiemployer plans, which are pensions "to which more than one employer is required to contribute" and that "[are] maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer." 29 U.S.C. § 1002(37)(A); *see also Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Illinois Range, Inc.*, 71 F. Supp. 2d 864, 870 (N.D. Ill. 1999) ("A multiemployer plan is a union-sponsored plan which covers more than one unaffiliated employer."). Multiemployer plans benefit "workers who are employment-peripatetic by nature," who over time may work for "many small companies that are too small to justify an individual plan." *Matter of Appletree Markets, Inc.*, 19 F.3d 969, 978 (5th Cir. 1994) (citation and quotations omitted). These plans allow workers to change jobs while retaining their pension benefits, which are not tied to one particular employer. *Id.*

Congress added the MPPAA amendments in 1980 "to cure the problems arising when an employer ceased making payments to a pension plan fund," leaving "the plan … with vested pension obligations which were only partially funded." *Robbins v. Lady Baltimore Foods, Inc.*, 868 F.2d 258, 261 (7th Cir. 1989). A vested benefit is one that is guaranteed to the worker after a number of years of service. *Nachman Corp. v. Pension Ben. Guar. Corp.*, 446 U.S. 359, 363-64 (1980). So "[a] plan's vested liability is the actuarial present value of the benefit obligations which have vested," and a plan's unfunded vested liability is "[t]he difference between [the vested liability] and the value of the plan's assets … ." *Peick v. Pension Ben. Guar. Corp.*, 724 F.2d 1247, 1255-56 (7th Cir. 1983). To guarantee the stability of

unfunded plans, the MPPAA required any employer that partially or completely withdrew from paying into a plan—for example, by selling a business, substantially downsizing, or going non-union—to pay for its share of unfunded vested plan benefits. 29 U.S.C. § 1381. This obligation is called "withdrawal liability," which "protect[s] the other employers in the multi-employer plan from having to pay for those benefits." *Santa Fe Pac. Corp.*, 22 F.3d at 727 (citation omitted); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1371 (7th Cir. 1992) (withdrawal liability ensures "that the financial burden of [a withdrawing company] … will not be shifted to the other employers in the plan"). Without withdrawal liability, Congress believed that the "added burdens upon employers who remained as participants in plans might induce more of them to remove themselves from multiemployer plans. This process could discourage the entry of new plan participants and precipitate the financial failure of less stable plans." *Peick*, 724 F.2d at 1267.

Specifically, the MPPAA assessed withdrawal liability when an employer "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a).[5] Congress, however, enacted an "exception" for the building and construction

---

[5]Withdrawal liability also applies for a partial withdrawal, which is not at issue in this case. That occurs when "(1) there is a 70-percent contribution decline, or (2) there is a partial cessation of the employer's contribution obligation." 29 U.S.C. § 1385(a).

industry. 29 U.S.C. § 1383(b)(1). An employer in this industry (the parties agree Weis is in it,[6] Joint Stip. ¶ 2(b)) owes withdrawal liability only when

> (A) [the] employer ceases to have an obligation to contribute under the plan, and
>
> (B) the employer—
>
>> (i) continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or
>>
>> (ii) resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption.

29 U.S.C. § 1383(b)(2). As the Ninth Circuit has explained, the construction-industry provision "impos[ed] withdrawal liability only when a contractor's obligation to the fund ceased and the contractor continued doing covered work." *H.C. Elliott, Inc. v. Carpenters Pension Trust Fund for N. California*, 859 F.2d 808, 811 (9th Cir. 1988). Put another way, construction companies need *not* pay withdrawal liability if they leave the industry altogether. Congress let those

---

[6]An employer is in the building and construction industry if

> (A) substantially all the employees with respect to whom the employer has an obligation to contribute under the plan perform work in the building and construction industry, and
>
> (B) the plan-
>> (i) primarily covers employees in the building and construction industry, or
>>
>> (ii) is amended to provide that this subsection applies to employers described in this paragraph.

29 U.S.C. § 1383(b)(1).

companies off the hook "because the construction industry as a whole does not necessarily shrink when a contributing contractor leaves the industry; employees are often dispatched to another contributing contractor." *Id.* (citing H. R. Rep. No. 96-869, 96th Cong., 2d Sess, pt. 1, at 75, *reprinted in* 1980 U.S. Code Cong. & Admin. News 2918, 2943). Thus, "[t]hese normal events do not pose an undue threat to a plan as long as contributions are made for whatever work is done in the area." *Id.* (quoting H. R. Rep. No. 96-869, 96th Cong., 2d Sess, pt. 1, at 75).

## 2. Covered Work

The central dispute in this case is whether Weis "continue[d] to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required," 29 U.S.C. § 1383(b)(2)(B)(i), and thus owes withdrawal liability. The Arbitrator answered this question in the negative, finding that the CBAs did not obligate Weis to contribute to the Fund for work done by finishers. Arb. Award at 41-42. But the Fund argues that the Arbitrator erred "because the [construction industry] exemption does not apply to an employer who ceases to be bound to contribute on behalf of employees covered by a given collective bargaining agreement and *continues to perform the same work with different employees.*" Pls.' Br. at 4 (emphasis in original). According to the Fund, because it is undisputed that "[d]uring the calendar year 2009 and each calendar year through the present, employees of Weis have performed some of the tasks included in [the laborers' work jurisdiction]," Joint Stip. ¶ 2(f), Weis must therefore contribute to the *laborers'* fund for work that *non-laborers* performed. Pls.' Br. at 11-23.

In applying the governing statute, the Arbitrator first concluded that Weis "continue[d] to perform work in the jurisdiction of the [laborers'] collective bargaining agreement," 29 U.S.C. § 1383(b)(2)(B)(i), because "[a]fter 2009, Company finishers may have … performed some tasks within the general jurisdiction of the Laborers' CBA." Arb. Award at 40. This is a fact-question that this Court cannot disturb unless clearly erroneous. As it turns out, there is no need to reevaluate it because the parties have stipulated to this fact. Joint Stip. ¶ 2(f) ("During the calendar year 2009 and each calendar year through the present, employees of Weis have performed some of the tasks included in [the laborers' work jurisdiction]," which "overlapped with work described in the BAC and ICE CBAs."); R. 26, Def.'s Br. and Resp. at 13 (Weis admitting that "[b]ecause certain tasks such as cleaning up debris or unloading stone occur at every job site, overlap is inevitable"). And the Arbitrator also explained that "[t]he Fund is correct that the nature of the work performed is dispositive," rejecting Weis's argument that the finishers were not doing work that was covered in the laborers' CBA merely because the finishers were tending to setters, and not to bricklayers. Arb. Award at 40. No clear error here.

But that is only part of the statute. The Arbitrator then held that the overlapping work "[was] statutorily insufficient to create withdrawal liability. Additional language in ERISA … provides that withdrawal liability is created only 'if contributions were *previously required*' for that work." *Id.* at 41 (quoting 29 U.S.C. § 1383(b)(2)(B)(i) (emphasis added)). So to determine whether Weis was "previously required" to make pension payments into the *laborers'* pension fund for

18

work performed by employees of *other unions*, the Court must look to the applicable contracts.

As previously explained, the LIUNA CBA has a "work jurisdiction" clause describing the work covered by the agreement. That work

> include[s] the work which has been historically or traditionally or contractually assigned to and performed by members of the Laborers' International Union of North America including, but not limited to, the tending of masons, unloading, mixing and all handling of all materials. Conveying of such materials by any mode or method; unloading, erecting, moving, adjustment and dismantling of all scaffolds erected by Signatory Employers for any purpose or use by his own employees or others and the starting, stopping, fueling, oiling, cleaning, operating and maintenance of all mixers, mortar pumps, forklifts and/or other devices under the direction of the employer or its representatives.

LIUNA CBA art. V. The LIUNA CBA is an international (or master) agreement, and provides that issues involving "wages, fringe benefit contributions, hours and working conditions" are governed by the "locally negotiated collective bargaining agreement." *Id.* art. VII. The local CBA, in turn, is between the Concrete Contractors Association of Greater Chicago and the Construction and General Laborers' District Council of Chicago and Vicinity. Laborers' Local CBA. This local CBA clarifies that "the Employer agrees to make a pension contribution of $8.57 per hour for each hour worked by all Employees *covered by this Agreement* in addition to the wages and welfare payments herein stipulated." *Id.* art. VIII, ¶ 4 (emphasis added). On the one hand, "Employees covered by this Agreement" implies that Fund contributions are only required for employees who are *laborers*, because the agreement is between employers and the General Laborers' District Council of Chicago and Vicinity. On the other hand, the Fund points to a provision in the

19

Trust Agreement, which establishes the Fund and also binds Weis. *Id.* ("The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the Laborers' Pension Fund … and agrees to be bound by all actions taken by the Trustees … ."). That Trust Agreement provision defines "Employee" as "*[a]ny person* employed by an Employer who performs work within the jurisdiction of the Union as said jurisdiction is set forth in any applicable Collective Bargaining Agreement or by any custom or practice in the geographic area within which the Employer operates and his Employees perform work." R. 18-1, Pls.' Exh. 1, Trust Agreement art. I, § 3(b) (emphasis added). According to the Fund, the broad definition in the Trust Agreement mandates Weis to make contributions for any employee—whether a laborer, worker from a different union, or non-union worker— as long as that employee is doing any work outlined by the LIUNA CBA. Pls.' Br. at 5-6.

The Arbitrator, however, rejected the Fund's argument. Arb. Award at 41-42. Admittedly, the award's analysis could be labeled brief, but the award seemed to rely on the parties' history, custom, and past practice to resolve the contractual ambiguity. *Id.* CBAs are contractually unique; unlike private common law contracts, which are negotiated out of free choice, CBAs are based on "pre-existing relationships not easily broken and remade." *Bhd. of Maint. of Way Emps. v. Atchison, Topeka & Santa Fe Ry. Co.*, 138 F.3d 635, 640 (7th Cir. 1997). So when interpreting a CBA, "[courts] must look beyond the document itself" and "look to the parties' 'practice, usage and custom,'" while being careful not to contradict the

explicit text. *Id.* at 641 (quoting *Transp.-Commc'n Emp. Union v. Union Pac. R. Co.*, 385 U.S. 157, 161 (1966)). In this case, the arbitration award focused on the parties' historical course of dealing to interpret the contract, revealing that the Fund had *not* previously required Weis to make contributions for any work performed by bricklayers, marble setters, or finishers. Arb. Award at 41. The award pointed to the testimony of Paul Connolly, the business manager and secretary-treasurer of the Laborers' International Union of North America, Union Local Number 4, who is also a Trustee of the Fund. *Id.* As the award noted, Connolly "testified that the Fund does not collect contributions from an employer that has already made contributions to another pension fund for the same work." *Id.* In particular, he stated: "[T]he policy of the Fund is that if contributions are made to another fund, then we allow that. We don't go back and try to bang [the Employer] twice." Arb. Tr. 546:16-19. Crediting Connolly's "accurate testimony," the award reached the "unavoidable conclusion" that the relevant contracts did not require Weis to pay into the Fund for work done by employees from a different union, when Weis had made contributions into the latter employees' pension fund. Arb. Award at 42.

The Court affirms the award's finding because it was not clearly erroneous. *See United States v. Williams*, 198 F.3d 988, 992 (7th Cir. 1999) (explaining that "contract interpretation is a mixed question of law and fact" and that "disputed terms … are matters of fact"). The parties' past practice and custom showed that they interpreted the CBAs as not requiring Fund contributions for other union workers when the employer paid into other pension plans for that work. Connolly's

testimony, which the award deemed credible, conceded that "[he was] not aware of any time that [his] fund has issued an audit and required Weis to pay hours that they have already reported or contribution hours that they have already reported to another fund … . There is no [such] requirement." Arb. Tr. 545:6-13. Unlike other unions, the laborers "wouldn't go after a contractor based on his contribution on an employee that may be on a different trade that we may consider our work … . We don't do it." *Id.* 548:13-549:2. *See also id.* 546:1-13 (even though Connolly was aware that other unions used this strategy, "[the Fund] ha[s] never requested" contributions for hours worked by those in other unions); *id.* 546:20-547:15 ("It's the policy of the laborers not to do that … [n]ot to bang them twice for the same hours[.]"); *id.* 547:16-549:17 (confirming that Fund contributions are not required for a finisher's hours for interior marble installation, exterior marble installation, exterior limestone installation, or unloading materials from a truck on the job site). And the Fund does not point to any contrary evidence showing that the Fund ever *did* require such contributions. Thus, the award's conclusion was supported by the evidence, which showed that the CBAs did not require contributions for work performed by non-laborers—even when that work was within the laborers' jurisdiction—when Weis made contributions to the other union's pension fund for that work. In turn, that work was not "the type for which contributions were previously required," 29 U.S.C. § 1383(b)(2)(B)(i), so no withdrawal liability is due.

### 3. The Fund's Arguments

The Fund nevertheless argues that the Arbitrator's conclusion was clearly erroneous because it (1) is an inappropriate construction of the statute contrary to circuit precedent; and (2) reduces the contribution base of the Fund, contrary to the purposes of the MPPAA. On the first argument, the Fund argues that the Arbitrator erred in interpreting the withdrawal liability statute by concluding that "previously required" under 28 U.S.C. § 1383(b)(2)(B)(i) meant "previously collected by the plan," as opposed to "previously required by the collective bargaining agreement." Pls.' Br. at 18. But this is not so. As explained above, the award adopted the latter construction, and then looked to the CBAs to determine the employers' obligations. In making that determination—that is, in interpreting the CBA—what the Fund previously collected appropriately informed the award's decision. *See supra.*

In resisting this conclusion, the Fund points to *Trustees of the Glaziers, Architectural Metal and Glass Workers Local Union v. Gibson* for the proposition that "[a]s a matter of law, the Seventh Circuit permits enforcement of two separate CBAs with overlapping work jurisdictions." 99 F. App'x 740, 741 (7th Cir. 2004). But *Glaziers* does not undermine the award's conclusion for two reasons. For one, it is an unpublished order issued before 2007 and may be cited only "to support a claim of preclusion … or to establish the law of the case from an earlier appeal in the same proceeding." 7th Cir. R. 32.1(d). So even if *Glaziers* is on point, it cannot be used for support, not even as a non-precedential disposition. And, in any event, *Glaziers* highlights the importance of the terms of the CBA. In that case, which was

about delinquency payments under 29 U.S.C. § 1145, the employer hired iron workers to perform work covered by the glaziers' CBA. *Glaziers*, 99 F. App'x at 741. Although the employer could not escape contributions to the glaziers' pension fund by making contributions to the iron workers' fund, "[t]he clear terms of [the employer's] CBA with the glaziers union require[d] contributions to the Fund for glazing work." *Id.* at 742. The Seventh Circuit further explained that "[t]he Fund's claim is based on the terms of the CBA, not on principles of labor law." *Id.* at 741. In other words, it is not the case that ERISA requires, as a matter of *law*, that an employer must always contribute to two pension funds when the two unions' work jurisdictions overlap. *Id.* Rather, it depends on what is provided in the *CBA*—and in Weis's case, the history and custom showed that the laborers' CBA did *not* require contributions for work done by finishers or setters when the employer had made pension contributions to a different union.

For the same reasons, the earlier-cited Ninth Circuit case, *H.C. Elliott, Inc. v. Carpenters Pension Trust Fund for Northern California*, is also distinguishable, because the contractual terms in that case were different from this case. 859 F.2d at 808. Elliot was a housing contractor who terminated a CBA with the carpenters' union when negotiations stalled. *Id.* at 810. Afterwards, Elliot began subcontracting its carpentry work (rather than using its own employees) and stopped making contributions to the carpenters' trust fund. *Id.* The Ninth Circuit held that Elliot was subject to withdrawal liability after examining "[t]he subcontracting provisions of the collective bargaining agreement to which Elliot was [a] signatory." *Id.*

Crucially, the carpenters' CBA "required that signatory employers subcontract only to contractors willing to comply with the provisions of the agreement." *Id.* And "when a subcontractor was delinquent in making payments to the trust fund, the signatory employer was required to make those payments." *Id.* That is, the CBA required Elliot "either to contribute on behalf of its own carpenters, to hire union subcontractors making their own contributions to the fund, or to make up any delinquencies" if the subcontractors did not pay. *Id.* at 813. "Work covered by the agreement, therefore, included work done by subcontractors for purposes of the signatory employer's fund payment obligations." *Id.* at 810. Once again, the critical difference between this case and *Elliot* is that the CBAs in *Elliot* specifically required the employer to make pension contributions for carpentry work done by subcontracted workers, even if they were not members of the carpenters' union. *Id.* But in this case, the arbitration award found that the laborers' CBA did not require employers to pay for work done by other union workers when Weis made contributions to the other union's pension fund.

Finally, the Fund argues that the award was inconsistent with the legislative purpose of the MPPAA. The purpose of withdrawal liability was "to protect the funding base of the plan so that remaining employers will not be forced to absorb additional cost increases" when one employer stops paying into the fund. *Artistic Carton Co. v. Paper Indus. Union-Mgmt. Pension Fund*, 1990 WL 205877, at *3 (N.D. Ill. Dec. 7, 1990), *aff'd sub nom. Artistic Carton Co. v. Paper Indus. Union-Mgmt. Pension Fund*, 971 F.2d 1346 (7th Cir. 1992) (quoting H.R. Rep. No. 869,

Part I, 96th Cong., 2d Sess. 52-53, *reprinted in* 1980 U.S. Code Cong. & Ad. News at 2941). As noted earlier, however, Congress included an exception for the construction industry, which "as a whole does not necessarily shrink when a contributing contractor leaves the industry; employees are often dispatched to another contributing contractor." *Elliot*, 859 F.2d at 811. In other words, because construction work is generally done "on a project-by-project basis, an employer's covered employment may fluctuate drastically, and when a project ends an employer's workers will normally remain in the labor pool available for employment by other contributing employers." *Cent. States, Se. & Sw. Areas Pension Fund v. Robinson Cartage Co.*, 55 F.3d 1318, 1323 (7th Cir. 1995) (quoting Definition of "Building and Construction Industry," 47 Fed. Reg. 42588 (1982)). Thus, these fluctuations are "normal events [that] do not pose an undue threat to a plan as long as contributions are made for whatever work is done in the area." *Elliot*, 859 F.2d at 812 (citing H.R. Rep. No. 96-869, 96th Cong., 2d Sess, pt. 1, at 75).

According to the Fund, "if Weis could continue doing the same type of work but change its work force to a different trade union, the plan's contribution base would be reduced because laborers have been replaced by non-laborers. Congress passed MPPAA to avoid that loss." R. 31, Pls.' Resp. and Reply at 4. The legislative history, however, does not undercut the award's conclusion because, as explained above, the Fund's base did *not* encompass work performed by other union members when Weis contributed to other pension funds for that work. *See supra*. Withdrawal liability was meant to prevent employers from escaping their contribution

obligations, but Weis never had an obligation in the first place to contribute to the Fund for finishers' work. Nor is this a situation where "the employer stays in the industry but goes non-union and ceases making payments to the plan." *Elliot*, 859 F.2d at 812; *see also Resilient Floor Covering Pension Trust Fund Bd. of Trustees v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1090 (9th Cir. 2015) (explaining that when an employer goes non-union but "continue[s] to undertake construction work without contributing to the plan … the number of employee hours for which contributions are made will go down."). In this case, Weis continued making contributions to the BAC pension plan and sustaining that funding base, so Weis was not escaping all pension-plan payments. The award here does not undermine the legislative purpose of the statute.

## B. Equitable Estoppel

The arbitration award also held that Weis was entitled to the defense of equitable estoppel because "the Company reasonably relied to its detriment on the Fund's repeated written assurances that the Company owed no additional contributions to the Fund." Arb. Award at 43. And "[b]ased on the Fund's assurances, the Company had no reason to believe it could eventually become liable for withdrawal liability based on hours not assigned to laborers." *Id.* at 43-44. The Fund argues that the award is wrong on this point because (1) equitable estoppel is not an available defense under the MPPAA; (2) the Fund did not intentionally make a misrepresentation; and (3) Weis did not reasonably rely on the Fund's audit reports. Pls.' Br. at 23-30.

In view of this Court's holding that Weis does not face any withdrawal liability, there is no need to decide this issue. For the sake of completeness, the Court does acknowledge that in this Circuit, it is not yet clear whether equitable estoppel is an available defense in an action involving a multiemployer pension plan. Because ERISA does not include any equitable defenses, federal courts can create federal common law only when it is consistent with the statute's purpose. *Cent. States, Se. & Sw. Areas Pension Fund v. Kabbes Trucking Co.*, 2004 WL 2644515, at *21 (N.D. Ill. Nov. 18, 2004) (citing, e.g*., Upholsterers' Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1327 (7th Cir. 1990)). The Seventh Circuit has expressed a "real resistance to the use of [equitable estoppel]" in the ERISA context due to concerns about a plan's "actuarial soundness." *Black v. TIC Inv. Corp.*, 900 F.2d 112, 115 (7th Cir. 1990) (citations omitted). That is, in a multiemployer plan, "[t]o allow one employer to bind the fund to pay benefits outside the strict terms of the Plan would be to make all the employers pay for one employer's misrepresentations, and to the extent that such payments damage the actuarial soundness of the Plan, it hurts all the employees as well." *Id.* The same would seem to be true when the misrepresentations are made by a pension fund; for example, if Weis was subject to withdrawal liability but successfully asserted estoppel, other employers would be responsible for making up Weis's statutorily required contributions. In that case, the other employers would also be required to pay benefits outside the strict terms of the Plan and for benefits that it did not owe. In *Black*, the Seventh Circuit explained that these actuarial concerns did not exist

in a single-employer plan where "there is no danger that others associated with the Plan will be hurt," so estoppel was an available defense. *Id.* But it "express[ed] no opinion as to the application of estoppel principles in other situations." *Id.*

Later, the Seventh Circuit got close to endorsing estoppel in the multiemployer plan context. In *Gorman Brothers*, the court held that an employer could assert a laches defense in a multiemployer-plan action (although the employer ultimately could not show reliance). *Teamsters & Emp'rs Welfare Trust of Illinois v. Gorman Bros. Ready Mix*, 283 F.3d 877, 881 (7th Cir. 2002). There, an audit revealed that the employer had failed to make pension contributions, but the local union promised to make the audit "go away." *Id.* at 879-80. The Seventh Circuit held that ERISA did not bar the laches defense. *Id.* at 883. It also explained that "laches and equitable estoppel are interchangeable" because "conduct claimed to create an estoppel consists mainly of delay that gives the defense a laches flavor, since laches means delay." *Id.* at 882. But it is unclear whether *Gorman Brothers* definitively held that equitable estoppel was available in cases involving *withdrawal liability* in multiemployer plans, because the case was ultimately about the laches defense in a delinquency action. The concurrence also emphasized "the principle that courts may not on equitable grounds decline to enforce the terms of an ERISA plan," because "a multi-employer pension or welfare trust is *not* just an ordinary contract." *Id.* at 887 (Easterbrook, J., concurring). So in the ERISA context, "'ordinary' state contract law" should not "prevent a plan from enforcing its written terms" and collecting obligatory payments. *Id.* After *Gorman*, some doubt

remains as to whether equitable estoppel applies in the multiemployer-plan context. *See, e.g.*, *Hancock v. Illinois Cent. Sweeping LLC*, 73 F. Supp. 3d 932, 943 (N.D. Ill. 2014) (explaining that "[the Seventh Circuit] has not yet, as far as the court can tell, explicitly approved [the] use [of equitable estoppel] as an affirmative defense in an action brought by a multiemployer plan," but considering the defense because the plaintiff did not object); *Kabbes Trucking Co.*, 2004 WL 2644515, at *22 (acknowledging *Gorman Brothers* but explaining that "[s]ince [ERISA] eliminates the authority of trustees to explicitly agree to a reduction or cancellation of an employer's pension contribution obligation, the trustees cannot possibly forfeit their ability to collect a promised payment because of their conduct (or inaction)."); *Smith v. Foremost Farms USA*, 2006 WL 1389316, at *7 (E.D. Wis. May 12, 2006) ("While the Seventh Circuit has not had the opportunity to hold conclusively that estoppel does not apply to multi-employer plans, this Court follows the dictum of *Black* that indicates the Seventh Circuit's reluctance to do so."); *Cent. States, Se. & Sw. Areas Pension Fund v. Kroger Co.*, 2003 WL 1720023, at *9 (N.D. Ill. Mar. 31, 2003) (explaining that "[i]t would appear that the Court [in *Gorman Brothers*] did not resolve the issue of whether laches and estoppel are the same."). In any event, there is no need to decide whether equitable estoppel is available in cases involving multiemployer plans, and if so, whether Weis has met the elements, because Weis has no withdrawal liability.

## IV. Conclusion

For the reasons described above, Weis's cross-motion for summary judgment [R. 25] is granted, and the Fund's cross-motion for summary judgment [R. 21] is denied. The arbitration award is confirmed.

ENTERED:

     s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: April 15, 2016